IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| SPIROS PSAROLOGOS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | 19 CV 7400 |
| | ) | |
| The CITY OF CHICAGO, a municipal corporation, Chicago Police Officers JOHN NADER, PATRICK GALLAGHER, STEPHEN KRAUSE, Chicago Police Sergeants STEVEN JUGO and ANGEL WARD, and Chicago Police Detective JAMES GONZALES, | ) ) ) ) ) ) ) | Magistrate Judge Weisman |
| | ) | |
| Defendants. | ) | |

## **COMPLAINT**

Plaintiff, SPIROS PSAROLOGOS, by his attorneys, The HAMILTON LAW OFFICE, LLC, makes the following complaint against Defendants the CITY OF CHICAGO ("Defendant CITY"), Chicago Police Officers JOHN NADER, STEVEN JUGO, PATRICK GALLAGER, STEPHEN KRAUSE, JAMES GONZALES, and ANGEL WARD ("Defendant OFFICERS"):

### **JURISDICTION and VENUE**

1. This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation under color of law of Plaintiff's rights as secured by the United States Constitution and Illinois common law.

2. This Court has jurisdiction over the action pursuant to 28 U.S.C. §§ 1331, 1434, and 1367.

3. Venue is proper under 28 U.S.C. § 1391(b). The events giving rise to the claims asserted in this complaint occurred within this district.

### **PARTIES**

4. Plaintiff is a 38 year-old resident of Chicago, Illinois.

5. At all relevant times, Defendant OFFICERS are or were Chicago police officers, employed by Defendant CITY, acting under color of law and within the scope of their employment.

6. Defendant CITY is a municipal corporation duly incorporated under the laws of the State of Illinois, and was at all relevant times the employer and principal of Defendant OFFICERS. Should Plaintiff prevail on his claims, Defendant CITY is liable to Plaintiff as the principal on Plaintiff's state law claims pursuant to the doctrine of *respondeat superior*, and must indemnify Defendant OFFICERS on Plaintiff's federal claims pursuant to 735 ILCS 10/9-102.

### Defendant NADER's Road Rage Beating Of Plaintiff

7. On the afternoon of May 31, 2016, Plaintiff was working as a ride-sharing driver on the City's north side, near the Irving Park East neighborhood.

8. As Plaintiff was turning southbound on Western Avenue from Irving Park Road, Defendant NADER pulled alongside Plaintiff.

9. Defendant NADER began screaming at Plaintiff.

10. Defendant NADER was in his personal vehicle on his way to work at the 19th District police station.

11. Plaintiff attempted to get away from Defendant NADER who continued to scream and follow Plaintiff.

12. At one point, Plaintiff was stopped at a red light and Defendant NADER got out of his vehicle and approached Plaintiff's car on foot.

13. Defendant NADER kicked Plaintiff's car, causing a dent in the front driver's side door.

14. Defendant NADER threatened to "put a bullet in [Plaintiff's] head" or words to that effect.

15. Plaintiff pulled into the Jewel parking lot at Roscoe and Western in an attempt to get away from Defendant NADER.

16. Defendant NADER followed Plaintiff into the Jewel parking lot.

17. Plaintiff called 911 twice during this incident.

18. Defendant NADER got out of his car in the Jewel parking lot and again approached Plaintiff's car on foot.

19. Defendant NADER reached through Plaintiff's window and began beating Plaintiff with some sort of baton.

20. Defendant NADER then pulled Plaintiff out of his vehicle and continued beating him.

21. Plaintiff was able to get away from Defendant NADER and back into his car.

22. Plaintiff drove to the nearest police station at Belmont and Western.

23. Defendant NADER followed Plaintiff to the 19th District police station where NADER happened to be going anyway to report for work.

### Defendant OFFICERS Arrest The Crime Victim Instead Of Their Fellow Officer

24. As Plaintiff was walking into the 19th District police station, Defendants NADER, JUGO, and WARD were exiting the building.

25. Defendants JUGO and WARD were sergeants and thus had supervisory authority over the other Defendant OFFICERS.

26. Plaintiff told Defendants JUGO and WARD what happened.

27. Defendants JUGO and WARD brought Plaintiff into the police station and put him into an interview room.

28. Defendant JUGO told Plaintiff that Defendant NADER would not press criminal charges of battery against him if Plaintiff admitted to speeding and reckless driving.

29. Plaintiff refused to admit to crimes he did not commit.

30. Plaintiff complained to both Defendant JUGO and Defendant GONZALES that he (Plaintiff) had been attacked and beaten by Defendant NADER.

31. Defendant OFFICERS created false police reports and criminal complaints relating to the circumstances of Plaintiff's arrest.

32. Defendant OFFICERS caused Plaintiff to be charged with battery and resisting arrest.

33. Plaintiff was taken by ambulance to the hospital on account of the injuries he received from Defendant NADER.

34. Plaintiff had to hire a criminal defense attorney to represent him on the false criminal charges Defendant OFFICERS initiated against him.

35. On September 27, 2017, Plaintiff was forced to stand trial on the false charges Defendant OFFICERS brought against him.

36. Defendants NADER and GALLAGHER and Plaintiff testified at the criminal trial.

37. Plaintiff was acquitted on all counts.

38. Defendant NADER was acting within the scope of his employment as a Chicago police officer during his interactions with Plaintiff.

**The City of Chicago's Long History Of Covering Up And Condoning Police Misconduct**

39. The Chicago City Council has long been aware of the regulatory, supervisory and disciplinary failures plaguing the Chicago Police Department. At an October 2007 meeting of the Council's Committee on the Budget and Government Operations, a Council member remarked of OPS that "there is no follow-up [of citizen complaints], and I think we have to move beyond the code of silence and the protection of the police officers and command staff at any cost."

40. The Chicago City Council subsequently enacted an ordinance in 2007 to replace OPS with IPRA, primarily in response to Council and citizen concerns and complaints about how allegations of police misconduct were being investigated.

41. However, the five-year collective bargaining agreements entered into by the Fraternal Order of Police and the City of Chicago pre- and post-IPRA contained *identical* provisions preserving and protecting police power in disciplinary investigations: a Bill of Rights affording an accused officer the right to the full name of the complainant and the right to examine allegations before

4

taking a stance regarding the charges; restrictions on the investigation of anonymous complaints; and limitations on the use of previous un-sustained complaints against the officer in subsequent disciplinary actions.

42. In addition, the Chicago Police Department has a long history of covering up police misconduct, including off-duty misconduct, and Defendant CITY has been aware of this widespread custom and practice for many years.

43. This "Code or Silence" and/or "Blue Shield," wherein the City of Chicago covers up and condones police misconduct to shield its officers, including dangerous officers that pose a threat to the public, such as Defendant NADER, allows officers to act with impunity and to feel and act as though their acts of misconduct will go unpunished and will not be properly investigated.

44. The effect of such policy is that officers, including but not limited to Defendant NADER, feel they can act with impunity and without fear of reprimand.

45. For example, on November 13, 2012, in the case of *Obrycka v. City of Chicago, et al.*, 07 CV 2372, a federal jury returned a verdict against Defendant CITY and former Chicago police officer Anthony Abbate, finding that Defendant CITY had a widespread, persistent custom or practice of covering up police misconduct, *i.e.*, the Code of Silence.

46. The *Obrycka* case arose out of Abbate's severe beating of a female bartender while Abbate was off-duty and intoxicated.

47. Abbate and other Chicago police officers attempted to suppress and destroy surveillance camera video recordings of the attack and made threats against Obrycka and other employees of the bar where she worked in an effort to cover up Abbate's misconduct.

48. The *Obrycka* jury found that Defendant CITY's persistent widespread custom or practice was the moving force behind Abbate's conduct when he physically beat the plaintiff on

5

February 19, 2007, and awarded the plaintiff in that case $850,000 in compensatory damages.

49. On December 9, 2015, Chicago Mayor Rahm Emanuel delivered a speech to the City Council in which he admitted that a code of silence exists and has long existed within the Chicago Police Department.

50. Mayor Emanuel stated that this tendency to ignore, deny, or cover up the bad actions of police officers leads to a culture where extreme acts of abuse are more likely.

51. Mayor Emanuel also admitted that "[s]upervision and leadership in the police department and the oversight agencies that were in place failed," and that "Our city has been down this road before."

52. Mayor Emanuel also stated that he intended to create a task force to examine these failures within IPRA that would reach back to at least 2007, well before the incident specified in this complaint.

53. In April 2016, the Mayor's "Police Accountability Task Force" supported the Mayor's statements that a code of silence or blue shield exists within the Chicago Police Department.

54. Specifically, the Mayor's Task Force concluded, among other things, that the code of silence is "institutionalized and reinforced by CPD rules and polices that are also baked into the labor agreements between the various police unions and the City."

55. The Mayor's Task Force also found that IPRA "investigations are riddled with structural, cultural and procedural problems that cast doubt on the intentions and integrity of the investigating agencies and the larger oversight system. Misconduct goes uninvestigated despite the availability of information about these incidents; investigations are hampered by unreasonable and unjustified procedures; and the investigative agencies lack the resources and support to be effective, and show troubling signs of bias."

56. The *Police Accountability Task Force Report 2016* identified that the Chicago Police Department has "no dedicated system [that] exists to identify and address patterns or practices…" and "[s]ince its inception, IPRA has had the power to examine patterns of complaints when investigating misconduct, but has not exercised it."

57. The United States Department of Justice ("DOJ") undertook an investigation of the Chicago Police Department and released a report with its findings in January 2017.

58. The DOJ report concluded that IPRA did not adequately investigate allegations of police misconduct. For example, the DOJ report found that IPRA sustained fewer than 2% of the 30,000 police misconduct complaints Defendant CITY received from 2011 to 2016.

59. The DOJ report also found that IPRA investigations were biased in favor of police officers accused of misconduct.

60. The DOJ report identified IPRA's biased investigative techniques, such as "questioning of officers [that] is often cursory and aimed at eliciting favorable statements justifying the officer's actions rather than seeking truth. Questioning is often marked by a failure to challenge inconsistencies and illogical officer explanations, as well as leading questions favorable to the officer."

61. The DOJ report also found that reports drafted by IPRA investigators at the conclusion of an investigation, known as "Summary Reports," "are often drafted in a manner favorable to the officer by omitting conflicts in testimony or with physical evidence that undermine the officer's justification or by exaggerating evidence favorable to the officer."

62. The DOJ report concluded that IPRA's deficiencies in investigating police misconduct "played a central role" in allowing patterns of police misconduct to persist.

63. The DOJ report also outlined the Chicago Police Department's significant history of violent misconduct by off-duty police officers, as well as efforts by the Chicago Police Department to cover up off-duty misconduct.

64. For example, "In 2006, a patron in a restaurant claimed that after being beaten up by several off-duty officers, he and witnesses to that incident were falsely arrested for battery to cover up the incident."

65. "In another case in 2009, the City settled for $100,000 a lawsuit alleging a CPD lieutenant falsely arrested him for battery to cover up the officer's abuse of the plaintiff."

66. "In 2014, the City settled another lawsuit for $30,000 where a driver alleged an off-duty officer aimed his gun at him and then filed false battery charges to cover it up when other officers arrived on the scene."

67. The DOJ report became the basis of a legal action instituted against Defendant CITY by the Illinois Attorney General's Office, which led to a consent decree intended to reform the Chicago Police Department.

68. In January 2019, Defendant CITY entered into a court-approved consent decree intended to reform the Chicago Police Department.

69. The consent decree requires the City to conduct automatic investigations of officer-involved domestic violence and public reporting on each investigation of officer-involved assault.

70. These systemic failures by the City of Chicago to impartially investigate allegations of excessive force by its police officers; its failure to discipline its officers for improper uses of force have contributed to the existence of a Code of Silence in the Chicago Police Department and in the City's investigative agencies. These failures by the City have encouraged officers like Defendant NADER in his belief that he could beat Plaintiff in a public place in broad daylight with impunity.

## COUNT I
(42 U.S.C. § 1983, Excessive Force)

71. Each of the preceding paragraphs is incorporated as if fully restated here.

72. As described above, the intentional conduct of Defendant NADER towards Plaintiff was objectively unreasonable under the circumstances, and constituted excessive force in violation of the Fourth Amendment to the United States Constitution.

73. As a direct and proximate result of this excessive force, Plaintiff suffered damages, which will be proven at trial.

**WHEREFORE**, Plaintiff prays for a judgment against Defendant NADER in a fair and just amount sufficient to compensate him for the injuries he has suffered, plus punitive damages, as well as costs, attorneys' fees, and such other relief as is just and equitable.

## COUNT II
(42 U.S.C. § 1983, False Arrest)

74. Each of the foregoing paragraphs is incorporated as if fully restated here.

75. As described above, Defendant OFFICERS arrested Plaintiff, or caused him to be arrested, without probable cause and legal justification to do so, in violation of the Fourth Amendment to the United States Constitution.

76. As a direct and proximate result of this illegal arrest, Plaintiff suffered a loss of liberty and other damages, which will be proven at trial.

**WHEREFORE**, Plaintiff prays for a judgment against Defendant OFFICERS in a fair and just amount sufficient to compensate him for his damages, plus punitive damages, as well as court costs, attorney's fees, and such other relief as is just and equitable.

## COUNT III
(42 U.S.C. § 1983, Supervisory Liability)

77. Each of the foregoing paragraphs is incorporated as if fully restated here.

78. As described above, Defendants JUGO and WARD were the supervisors on the scene of Plaintiff's arrest.

79. As described above, Defendant OFFICERS unlawfully seized Plaintiff and initiated false charges against him, in violation of the Fourth Amendment to the United States Constitution.

80. At all relevant times, Defendants JUGO and WARD are or were sergeants and supervisory-level police officials on the Chicago Police Department.

81. It was the responsibility of Defendants JUGO and WARD to supervise the conduct of Defendant OFFICERS who violated Plaintiff's constitutional rights.

82. Rather than properly supervising the Defendant OFFICERS, Defendants JUGO and WARD condoned or were recklessly indifferent to their unlawful behavior and failed to take appropriate steps to investigate the situation or prevent harm to Plaintiff.

83. As a direct and proximate result of Defendants JUGO and WARD's failure to supervise Defendant OFFICERS, Plaintiff suffered damages, which will be proven at trial.

**WHEREFORE**, Plaintiff prays for a judgment against Defendants JUGO and WARD in a fair and just amount sufficient to compensate him for his damages, plus punitive damages, as well as court costs, attorney's fees, and such other relief as is just and equitable.

### COUNT IV
(42 U.S.C. § 1983, *Monell* Claim)

99. Each of the preceding paragraphs are incorporated as if fully restated here.

100. The misconduct of Defendant NADER alleged above was undertaken pursuant to the policy and practice of the Defendant CITY of Chicago.

101. As a matter of both policy and practice, Defendant CITY has encouraged the type of police misconduct at issue in this case by failing to adequately train, investigate and/or discipline Chicago police officers for their own use of excessive force and for the covering up of their

fellow officers' use of excessive force, even in off-duty situations such as the one here, and these failure constitute deliberate indifference.

102. The following of Defendant CITY's policies and persistent widespread customs and practices were the driving force behind Defendant NADER's misconduct and caused harm to Plaintiff:

   A. The CITY of Chicago has encouraged its police department and investigative agencies to protect its police officers from accountability by allowing and fostering a "code of silence" in the Chicago police department.

   B. The CITY has failed to adequately and impartially investigate allegations of police misconduct.

   C. The CITY has failed to adequately retrain and discipline officers for their misconduct.

   D. The CITY has failed to develop and implement an effective "early warning system" to identify and address problematic behavior by its police officers.

   E. Finally, the CITY has failed to terminate officers who have demonstrated they are dangerous and pose a foreseeable risk to public safety.

103. These policies, practices or customs of the Defendant CITY, individually and collectively, have been maintained and/or implemented with deliberate indifference by Defendant CITY, encouraging and allowing Defendant NADER to commit the wrongful acts against Plaintiff, and therefore acted as the direct and proximate cause of the injuries sustained by Plaintiff.

104. These policies, practices or customs of Defendant CITY, individually and/or collectively, were the moving force behind Defendant NADER's conduct, depriving Plaintiff of his rights under the United States Constitution.

   **WHEREFORE**, Plaintiff prays for a judgment against Defendant CITY in a fair and just amount sufficient to compensate him for his damages as well as such other relief as is just and equitable.

## COUNT V
(Illinois Malicious Prosecution Claim)

105. Each of the foregoing paragraphs is incorporated as if fully restated here.

106. As described above, Defendant OFFICERS willfully, intentionally and recklessly initiated criminal proceedings against Plaintiff, or caused them to be initiated, and/or caused the criminal proceedings to continue without probable cause to believe Plaintiff had committed any of the crimes charged.

107. Defendant OFFICERS created false and inaccurate police reports and other documents pertaining to the circumstances of Plaintiff's arrest, and provided false information to prosecutors handling Plaintiff's criminal case. This was done with malice and/or reckless indifference to Plaintiff's rights.

108. The criminal case against Plaintiff was terminated in his favor, in a manner indicative of his innocence.

109. As a direct and proximate result of Defendant OFFICERS' malicious prosecution, Plaintiff suffered damages, which will be proven at trial.

   **WHEREFORE**, Plaintiff prays for a judgment against Defendant CITY in a fair and just amount sufficient to compensate him for his damages, as well as such other relief as is just and equitable.

**PLAINTIFF DEMANDS TRIAL BY JURY.**

Respectfully submitted,

SPIROS PSAROLOGOS, Plaintiff

By: /s Torreya L. Hamilton
   Attorney for Plaintiff

HAMILTON LAW OFFICE, LLC
53 West Jackson Boulevard, Suite 452
Chicago, Illinois 60604
312.726.3173
tlh@thehamiltonlawoffice.com
Attorney No. 6229397

By: /s Thomas P. Needham
   Attorney for Plaintiff

Law Office of Thomas P. Needham
53 West Jackson Boulevard, Suite 452
Chicago, Illinois 60604
312.726.3171
tpn@needhamlaw.com
Attorney No. 6188722